UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

REBECCA DAWN BROUSSEAU,

Petitioner,

v.

CENTRAL CALIFORNIA WOMEN'S
FACILITY,

Respondent.

No.  2:13-cv-0301 JAM GGH (HC)

FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against her on May 7, 2010 in the Sacramento County Superior Court on charges of first degree murder with robbery special circumstance and for attempted robbery.  Clerk's Transcript, 63-66.  She seeks federal habeas relief on the following grounds: (1) the record contains insufficient evidence of the robbery-murder special circumstance because there is a lack of evidence that she acted with reckless indifference to human life; (2) the trial court improperly failed to instruct the jury on the lesser included offense of voluntary manslaughter; (3) the trial court improperly instructed the jury that she was "equally guilty" of the crime committed by the perpetrator; and, (4) the sentence of life without the possibility of parole is cruel and unusual punishment.  ECF No. 1, 2-3.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

1

1    BACKGROUND

2         In its partially published opinion which modified a judgment to strike a parole revocation

3 fine but otherwise affirmed petitioner's judgment of conviction, the California Court of Appeal

4 for the Third Appellate District provided the following factual summary:

5           Brousseau lured the victim, Khet Saelee, into a secluded alley by
promising an act of prostitution, to enable Lopez to rob the victim.
6           Lopez then shot the victim.  The authorities eventually persuaded
four other individuals associated with the robbery or its aftermath to
7           provide information regarding the facts and circumstances of the
murder.   These four individuals testified as witnesses for the
8           prosecution at trial. Defendants also testified.  What follows is a
summary of the pertinent testimony heard by the jury regarding the
9           facts and circumstances surrounding the planned robbery as well as
the victim's shooting and later events.
10

11           The alley runs between Roosevelt Avenue and Baker Avenue to the
north and south, "dead-ends" to the west, and is accessed from
12           Stockton Boulevard to the east.

13           On the night of November 22–23, 2008, the victim left home to go
to a bachelor party with his cousin, who had asked him to bring
14           beer.  His cousin called him after midnight and told him to hurry
up, but the victim never arrived.

15           The next morning, a man who lived in a unit at 4929 Baker Avenue,
near the end of the alley, found the victim in his car by the end of
16           the alley, and called 911.  The victim was in the front seat, which
was slightly reclined, and his pants were unbuckled.  The keys were
17           in the "on" position and the car was in reverse, and had been
backed into a fence, where it ran out of gas.  The victim had $5 in
18           his right front pants pocket, $200 in his right rear pants pocket, and
his wallet was found in the driver's door panel.   An unrolled
19           condom was on the ground near the car, but it was not tested for
DNA.
20

21           The victim had been shot through the left arm, and the bullet,
consistent with a .38–caliber bullet, had reentered the body and
22           pierced his heart. He could have lived long enough after being shot
to start his car, put it in reverse, and try to drive off.

23           A.  Crawford's Testimony

24           On April 8, 2009, Amy Lee Crawford was arrested for failing to
complete work project duties arising from a felony car theft
25           conviction; when questioned, she gave information about this case.
By the time of trial, she was on felony probation arising from an
26           unrelated burglary case.

27           Crawford testified she lived at 4929 Baker Avenue.  She had known
Lopez since he was 13, and had met Brousseau in 2008.  She had
28           sex with Lopez in the past, but had never dated him.  On the night

of the killing, she met defendants on her way to a liquor store. Lopez was intoxicated, "hypie" and "wild."  The trio walked toward Lopez's mother's house, but changed their minds and walked to Lynch's house, on Roosevelt Avenue "just beyond" the end of the alley.  Defendants planned "a quick come-up, and they were talking about robbing some tricks."  Lopez said, "Hey, let's rob some tricks, and [Brousseau] agreed to it, and she's, like, I'll go pull a trick."  Brousseau said she would go to Stockton Boulevard, and "bring them to the alley."  When Crawford objected that this was too close to her house, Lopez reassured her that "it wasn't going to be that serious."  Nothing was said about a gun.

According to Crawford, when the trio reached Lynch's house, Lopez alone went in and then came out.  They walked back, and Crawford and Lopez went to Crawford's yard and smoked cigarettes, while Brousseau went to Stockton Boulevard.  Lopez then stood "in the dark," waiting.  Crawford heard a car drive to the end of the alley, and after about five minutes, Lopez "went into the alley, and I heard arguing, and I heard Ms. Brousseau scream and get out of the car and start running down the alley."  Crawford went to the alley and saw Lopez "arguing with a guy through the window" saying, "Give me your money [.]"  She followed Brousseau "and we got almost to the end of the alley, and we heard a gunshot."  Crawford walked to Roosevelt Avenue, and saw Lopez "running ahead of us."  All three met at Lynch's house, although Crawford denied the meeting had been planned.  Lopez alone went in, and came out after five or 10 minutes.

While they were waiting for Lopez, Crawford asked Brousseau what happened, and she replied, "I freaked out.  He knocked on the window with a gun."  Brousseau also said she dropped a condom in the car.  When Lopez came out with Lynch, the two men smoked cigarettes, Lynch returned to his house, and the trio went to a back room that had been added on to Lynch's house, used methamphetamine, then fell asleep.  Crawford had sex with Lopez that night.  Later, Lopez said he left the gun at Lynch's house.

B.  Lynch's Testimony

Lynch was arrested on an unrelated matter at his house on April 8, 2009, with Bictoriano.  On March 2, 2010, Lynch agreed to testify truthfully for a reduction of a felony accessory to murder charge to a misdemeanor charge of interfering with a peace officer's investigation, with a time-served sentence.

Lynch testified he had lived at 4900 Roosevelt Avenue, about five or six houses down from where the victim's car was found.  He had known Lopez for 10 to 12 years, and had seen Brousseau about five times.  When Lopez came by the house that night, Lynch went outside to smoke a cigarette, and he did not let Crawford or Brousseau inside.  Lynch agreed that Lopez could use his back room, accessible through the backyard, later.  Lopez left for about 30 minutes, and when he returned, he asked if Lynch could store a gun.  Lynch told Lopez that Lopez knew where to put it, in a "tuck spot" on a hook under the stairs in Lynch's room.  Lynch did not

think Lopez had retrieved the gun from his house earlier and did not see him go to where guns were kept.  The next morning, Lopez's brother Bictoriano came to retrieve his gun, and Lynch told him where to get it, but did not see the gun.  He admitted he had seen Lopez with a gun when Lopez came in that night, describing it as a .38–caliber Smith and Wesson revolver.  When asked if Lopez had picked up the gun from Lynch earlier that night, Lynch replied, "I don't think so."  Lynch had seen Bictoriano with that gun before, which he would leave at Lynch's house.  According to Lynch, Bictoriano came to the house the morning after the murder, which was also the morning after Bictoriano's daughter's birth, and Lopez showed up after he left.  The three men were not together on or near November 23rd, and Lynch did not show the other two men a gun. FN3

> FN3.  Lynch testified that Bictoriano lied at the preliminary hearing, by saying he had come to Lynch's house three or four days after the shooting, by testifying the gun was not his, and by testifying Lynch showed him where the gun was, in the backyard.

C.  Bictoriano's Testimony

After Bictoriano was arrested and refused to give information, he was charged with accessory to murder.  On the day the preliminary hearing had been set, August 20, 2009, Bictoriano gave a statement to law enforcement.  He agreed to plead guilty and testify truthfully, in exchange for a time-served sentence.

Bictoriano testified his daughter was born November 22, 2008.  A few days later he visited Lynch to share this news. FN4  Later that day, at Lynch's, he saw Lopez.  Lopez "told me something had went wrong," he had hurt somebody."  Lopez told him about a gun; Lynch pointed towards a tree in the yard, where Bictoriano found the gun, and took it to "get rid of it" and help his brother.  It was a .38–caliber revolver.   He denied going to Lynch's house the morning of the shooting, and denied the gun was his.

> FN4.  Bictoriano testified his daughter was in intensive care and he stayed at the hospital after her birth, hence, he did not visit Lynch the morning after the killing.

D.  Peralez's Testimony and Jail Visits

On March 10, 2010, Monica Peralez was arrested while working as a prostitute, in a sting set up by Detective Cvitanov.  She was given use immunity to protect her from charges of prostitution, witness intimidation, and being an accessory to murder.

Peralez married Lopez after he had been charged with the instant offenses.  She had known Lopez for about eight years.  Lopez told her before he was arrested that he shot a man in the arm, in an alley, and also told her he shot the man by accident.  She visited Lopez in jail in April 2009, and he told her to visit Brousseau in jail, and tell her he was going to take all the blame and she should not say

anything.  Peralez had never met Brousseau.  Peralez wrote down the message, and held it up to the visiting room window.  Lopez had told her to write the message down, to avoid being recorded, and told her what to say.  The message said, "Chris says not to worry, just don't say nothing, it will all be okay, he's going to take the blame for it[.]"  It said nothing about a rape.  Brousseau looked at the note, then "[s]he was crying.  And she said that they had already found DNA on a condom, and that was that."  Brousseau mouthed the words.  Brousseau also made a gesture, mimicking a condom.  The next time Peralez visited Lopez, she told him what Brousseau said.  Brousseau's counsel asked Peralez if she could read lips, and she testified she could.

Detective Jason Cvitanov testified Peralez visited with Lopez on April 12, 2009, saw Brousseau on April 14, 2009, and next visited Lopez on April 19, 2009.  Nothing could be heard on the recording for the Peralez–Brousseau visit.  However, it was common for jail visitors to bypass the recording system by mouthing words or using notes.

E.  Brousseau's Testimony

Brousseau testified on her own behalf.  She had been homeless at the time of the murder, but sometimes stayed with Anthony Jimenez during November 2008, on the other side of a duplex from Crawford, who was Jimenez's sister-in-law.  Brousseau used drugs, worked as a prostitute, and had two misdemeanor theft convictions.  Late on the night of the shooting, after midnight, Brousseau left Jimenez's house to buy some cigarettes and turn a trick.  On the way to the store she met Crawford and Lopez, whom she knew.  They were talking about "coming up on"—or robbing—"a dude on a bike," but Brousseau never discussed robbing anyone with them, or taking anyone into the alley.  Because it was so cold, Brousseau turned around and walked back towards home.  When the victim pulled up in his car, she got in and directed him to the alley, where she "usually" took customers; she felt safe there because it was near where she was staying and people in the area knew her.  The victim unbuckled his trousers and leaned back as Brousseau searched in her bag for a condom.  Then she heard the victim cry out, "Oh, my God, he's got a gun."  As she fled, she saw Lopez by the driver's side door.  Although she had not seen a gun, and knew it was Lopez, she "felt safer running towards Stockton Boulevard."  When she reached the end of the alley, she ran into Crawford, "heard a pop" and knew someone had been shot, and they "ended up" in Lynch's back room.  Brousseau had not been at Lynch's house earlier.  After a short while, Lopez came in, and the three spent the night.

Brousseau testified Peralez visited her in jail, but Brousseau did not know who Peralez was, and was confused by her visit.  Peralez held up a note that said in part, Brousseau "needed to tell the cops that I was being raped," and Brousseau began to cry, because she was being further entangled in something she was not part of.  Brousseau never mouthed anything to Peralez about a condom or DNA.  When asked why she had never told this story before,

5

Brousseau said she was afraid of being a snitch.

F.  Lopez's Testimony

Lopez testified on his own behalf.  He was 23 and had known Lynch since he was about 10, they had been best friends, and he had known Crawford since he was 13.  He met Brousseau early in 2008, "around the neighborhood."  On the night of the shooting, he was intoxicated.  He was "[o]n ecstasy, a little bit of meth, and I was drinking."  While wandering around he met Crawford and Brousseau, and the trio "were just kind of chatting, talking while we were walking."  They were going to go to Lopez's mother's house, but he decided to go to Lynch's house, to hang out with "the girls" in Lynch's back room, which Lopez had used before.  Lynch allowed them to use the room.  They were there for about 15 minutes, with Lopez drinking beer and taking more ecstasy pills, while his companions used methamphetamine.  They decided to go get more beer.

At some point, Lopez got his brother Bictoriano's gun from Lynch's house.  The trio first went to Crawford's house, so she could get a jacket, and as Lopez waited by a picnic table, Brousseau left and said she would be back.  When Crawford came out, she and Lopez talked about what to do "because we didn't have any money.  We were trying to see if we could get some beer."  During trial, Lopez conceded that if Brousseau turned a trick, the trio would have had money for beer, although he maintained that particular topic was not discussed at the time.  As Lopez and Crawford talked, a car pulled up into the alley, which was not unusual, as people used the alley for drugs and prostitution.  When Lopez saw the car shaking for about three minutes, he approached, and saw Brousseau jump out and run, after she cried out.  Lopez claimed that he had no intent to rob anyone, but was trying to help, or stop the occupants from "causing a mess, causing trouble."  When Lopez asked the driver what he was doing, the driver reached toward his side, and Lopez got scared and shot him.

Lopez ran back to Roosevelt Avenue and went to Lynch's back room, where the "girls" joined him.  He testified he returned the gun to Lynch's room, but also testified, "I told him I fucked up and to put it up."  He did not call the police because he "had no right to shoot the man."  Lopez testified he had sex with both Crawford and Brousseau that night.  He admitted telling Peralez to see Brousseau and tell her he was taking responsibility, but he did not tell Peralez to say anything about a rape.  He could not clearly explain why, if no robbery had been planned, it was important for Brousseau not to say anything.  He admitted that he told Peralez during one jail call or visit that he could get less time if he had been trying to protect somebody.  He denied he had told his brother Bictoriano that something went wrong; he said instead that he had told his brother, "I fucked up."  Lopez denied discussing a robbery with Brousseau or Crawford, and said that neither knew he had a gun.  When questioned by the police, he had said he saw a "guy" who was "getting on," i.e., raping his "home girl," whom he also described as "Amy's home girl."  Lopez also had told the police Brousseau

6

1   and Crawford knew he had a gun and they could have planned "to
    jack the guy" behind Lopez's back.  Lopez was impeached with one
2   car theft conviction and two burglary convictions.

3   People v. Lopez, 198 Cal.App. 4th 1106, 1108-1114, 131 Cal.Rptr.3d 467 (2011); Lod. Doc. 4 at

4   3-12.

5       After petitioner's judgment of conviction was affirmed by the California Court of Appeal,

6   she filed a petition for review in the California Supreme Court.  Lod. Doc. 6.  The Supreme Court

7   summarily denied that petition without comment or citation by order dated November 22, 2011.

8   Lod. Doc. 6.  On February 19, 2013, petitioner filed the operative petition for writ of habeas

9   corpus.  ECF No. 1.

10  DISCUSSION

11  I.  AEDPA Standards

12      The statutory limitations of federal courts' power to issue habeas corpus relief for persons

13  in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

14  Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

15          An application for a writ of habeas corpus on behalf of a person in
            custody pursuant to the judgment of a State court shall not be
16          granted with respect to any claim that was adjudicated on the merits
            in State court proceedings unless the adjudication of the claim-
17
18          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
19          determined by the Supreme Court of the United States; or

20          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
21          State court proceeding.

22      As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

23  2254(d) does not require a state court to give reasons before its decision can be deemed to have

24  been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

25  Rather, "when a federal claim has been presented to a state court and the state court has denied

26  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

27  of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris

28  v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits determination when

7

1    it is unclear whether a decision appearing to rest on federal grounds was decided on another

2    basis).  "The presumption may be overcome when there is reason to think some other explanation

3    for the state court's decision is more likely."  Id. at 785.

4         The Supreme Court has set forth the operative standard for federal habeas review of state

5    court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an *unreasonable*

6    application of federal law is different from an *incorrect* application of federal law.'"  Harrington,

7    supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000).

8    "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

9    'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786,

10   citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).

11        Accordingly, "a habeas court must determine what arguments or theories supported or …

12   could have supported[] the state court's decision; and then it must ask whether it is possible

13   fairminded jurists could disagree that those arguments or theories are inconsistent with the

14   holding in a prior decision of this Court."  Id.  "Evaluating whether a rule application was

15   unreasonable requires considering the rule's specificity.  The more general the rule, the more

16   leeway courts have in reaching outcomes in case-by-case determinations.'"  Id.  Emphasizing the

17   stringency of this standard, which "stops short of imposing a complete bar of federal court

18   relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

19   cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

20   was unreasonable."  Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

21        The undersigned also finds that the same deference is paid to the factual determinations of

22   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

23   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

24   decision that was based on an unreasonable determination of the facts in light of the evidence

25   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

26   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

27   factual error must be so apparent that "fairminded jurists" examining the same record could not

28   abide by the state court factual determination.  A petitioner must show clearly and convincingly

8

1  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct.

2  969, 974 (2006).

3       The habeas corpus petitioner bears the burden of demonstrating the objectively

4  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

5  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

6  show that the state court's ruling on the claim being presented in federal court was so lacking in

7  justification that there was an error well understood and comprehended in existing law beyond

8  any possibility for fairminded disagreement."  Harrington, supra, 131 S. Ct. at 786-787.  "Clearly

9  established" law is law that has been "squarely addressed" by the United States Supreme Court.

10  Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008).  Thus, extrapolations of

11  settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

12  Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653-54 (2006) (established law not permitting state

13  sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

14  prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

15  established law when spectators' conduct is the alleged cause of bias injection).  The established

16  Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

17  controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

18  federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

19       The state courts need not have cited to federal authority, or even have indicated

20  awareness of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8, 123 S. Ct.

21  at 365.  However, where the state courts have not addressed the constitutional issue in dispute in

22  any reasoned opinion, the federal court will independently review the record in adjudication of

23  that issue.  "Independent review of the record is not de novo review of the constitutional issue,

24  but rather, the only method by which we can determine whether a silent state court decision is

25  objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

26       When a state court decision on a petitioner's claims rejects some claims but does not

27  expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

28  the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___, 133 S. Ct.

1  1088, 1091 (2013).  However, if the state courts have not adjudicated the merits of the federal

2  issue, no AEDPA deference is given; the issue is reviewed *de novo* under general principles of

3  federal law.  Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).

4  II.  Sufficiency of Evidence

5        Petitioner claims that the record contains insufficient evidence to support the finding of

6  the robbery-murder special circumstance because there is a lack of evidence that she acted with

7  "reckless indifference to human life."  ECF No. 1, 29.  Specifically, she argues that she did not

8  possess the requisite knowledge that her participation in the crime presented a grave risk of death.

9  Id. at 29-33.

10        Petitioner raised this claim on direct appeal.  The California Court of Appeal rejected

11  petitioner's claim as set forth in the following portion of the opinion:

12            Brousseau contends no substantial evidence supports the robbery-

13  murder special circumstance finding, because the evidence does not show she acted with reckless indifference to human life.  Although

14  this was not a capital case, the issue she raises arises from capital sentencing rules formulated by the United States Supreme Court, explained as follows:

15

16            "[Penal Code section 190.2, subdivision (d)] was added to existing capital sentencing law in 1990 as a result of the

17  passage of the initiative measure Proposition 115, which, in relevant part, eliminated the former, judicially imposed

18  requirement that a jury find intent to kill in order to sustain a felony-murder special-circumstance allegation against a

19  defendant who was not the actual killer.  [Citation.]  Now, pursuant to section 190.2(d), in the absence of a showing of

20  intent to kill, an accomplice to the underlying felony who is not the actual killer, but is found to have acted with

21  'reckless indifference to human life and as a major participant' in the commission of the underlying felony,

22  will be sentenced to death or life in prison without the possibility of parole.  [Citations.]

23            "The portion of the statutory language of section 190.2(d) at issue here derives verbatim from the United States

24  Supreme Court's decision in Tison v. Arizona (1987) 481 U.S. 137 [95 L.Ed.2d 127] (hereafter Tison).  In Tison, the

25  court held that the Eighth Amendment does not prohibit as disproportionate the imposition of the death penalty on a

26  defendant convicted of first degree felony murder who was a 'major participant' in the underlying felony, and whose

27  mental state is one of 'reckless indifference to human life.' (Tison, supra, 481 U.S. at p. 158 & fn. 12 [95 L.Ed.2d at

28  pp. 144-145].)  The incorporation of Tison's rule into

10

section 190.2(d)—in express terms—brought state capital sentencing law into conformity with prevailing Eighth Amendment doctrine." (People v. Estrada (1995) 11 Cal.4th 568, 575.)

Brousseau contends there was no evidence she intended to kill, and argues that even if the record supports a finding she was aware of Lopez's purpose to commit robbery, and aided him by luring the victim into the alley, there was no evidence she knew he had a gun, therefore "the theft or robbery was likely to come off without anyone getting hurt."

In assessing this claim, we view the evidence and reasonable inferences in the light favorable to the verdict. (People v. Proby (1998) 60 Cal.App.4th 922, 928 (Proby).)

The jury was instructed that in order to return a true finding on the special circumstance, it had to find Brousseau acted with reckless indifference, and a person so acts "when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death."

Although Lopez testified at trial that he did not show Crawford or Brousseau the gun, nor did he mention a robbery to them, he had previously told law enforcement that both women knew he had the gun, and they may have been planning "to jack the guy" behind Lopez's back. The jury could have believed Lopez's inconsistent statement that the women knew he had a gun. (See People v. Johnson (1992) 3 Cal.4th 1183, 1219.) There was evidence the women were with Lopez when he presumably picked up the gun from Lynch's house, although they did not go inside Lynch's house. Given the evidence of joint activities, the jury could rationally find Lopez told the authorities a partial truth—the women knew he had the gun—and then lied about it at trial. The fact Brousseau knew Lopez had a gun shows that she acted with reckless indifference to the life of the man she lured into the alley. (See Proby, supra, 60 Cal.App.4th at pp. 928-930.)

Brousseau dismisses Lopez's inconsistent statement, arguing "this was merely part of his initial effort to shift the blame to the women and away from himself. [Citation.] This version was not relied on by the prosecutor in argument, and it was implicitly rejected by the jury's verdict convicting [Lopez] of the Saelee murder." We disagree. That this evidence was not mentioned in argument does not mean it was not considered, and the fact the jury did not credit a portion of Lopez's statement to the authorities does not necessarily mean that it discredited the earlier statement in its entirety. The People invited the jury to infer from other evidence that Brousseau knew Lopez had a gun, and did not disclaim reliance on Lopez's inconsistent statement about the gun.

Further, Brousseau's knowledge of the gun before the robbery is not necessary to uphold the jury's finding of special circumstances.

In People v. Hodgson (2003) 111 Cal.App.4th 566 (Hodgson),

11

Hodgson aided Salazar, who planned to rob the victim (Nam) when she drove into a gated parking garage.  Hodgson held the sliding garage door open, and tried to keep the door open to allow Salazar to get out of the garage.  (Hodgson, supra, 111 Cal.App.4th at pp. 570, 576-577.)  The court upheld a robbery-murder special circumstance:

> "The present case does not present evidence appellant supplied the gun, or was armed, or personally took the loot, or the like.  Nevertheless, his role in the robbery murder satisfies the requirement his assistance be 'notable or conspicuous in effect or scope.'

> "To begin with, this is not a crime committed by a large gang or a group of several accomplices.  Instead only two individuals were involved.  Thus, appellant's role was more 'notable and conspicuous'—and also more essential—than if the shooter had been assisted by a coterie of confederates. . . .  Because appellant was the only person assisting Salazar in the robbery murder his actions were both important as well as conspicuous in scope and effect.

> "A rational juror could also have found the evidence established appellant acted with 'reckless indifference to human life.'  This phrase 'is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death.'  Even after the first shot it must have been apparent to appellant Ms. Nam had been severely injured and was likely unconscious. . . .  Appellant had to be aware use of a gun to effect the robbery presented a grave risk of death.  However, instead of coming to the victim's aid after the first shot, he instead chose to assist Salazar in accomplishing the robbery by assuming his position at the garage gate and trying to keep it from closing until Salazar could escape from the garage with the loot."  (Hodgson, supra, at pp. 579-580.)

Similarly, in People v. Smith (2005) 135 Cal.App.4th 914 (Smith), disagreed with on another point in People v. Garcia (2008) 168 Cal.App.4th 261, 291-292, the court upheld a robbery-murder special circumstance as to a man who acted as a lookout outside a room while a codefendant beat and stabbed the victim in the room, and who did not seek help when the codefendant left the room, finding his actions reflected reckless indifference to the victim's life.  (Smith, supra, 135 Cal.App.4th at pp. 927-928.)

Brousseau's act of luring the victim into the secluded alley was critical to the robbery's success.  After hearing what she knew was a gunshot, she failed to help the victim or call 911.  Instead she went to Lynch's house and stayed with defendant and Crawford for the rest of the night and, on the evidence, engaged in sexual intercourse with Lopez.  Her actions reflect utter indifference to the victim's life.

12

> Brousseau claims the secluded location lessened the chance of violence, stating "the increased vulnerability of the victim here made it less likely that there would be resistance and injury." We disagree. A person trapped in a secluded place, with no help in the offing, might resist an attempted robbery, or the robber might be emboldened to act violently, with reduced fear of capture, in a secluded place.
>
> We conclude substantial evidence supports the robbery-murder special circumstance as to Brousseau.

Lopez, 198 Cal.App. 4th at 1115-1118; Lod. Doc. 4 at 13-18.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the writ, the federal habeas court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Id. at 1275 & n. 13.

The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings. Adamson v. Ricketts, 758 F.2d 441, 448 n. 11 (9th Cir.1985), vacated on other grounds, 789 F.2d 722 (9th Cir.1986) (en banc), rev'd, 483 U.S. 1, 107 S. Ct. 2680, 97 L.Ed.2d 1 (1987). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. McMillan v. Gomez, 19 F.3d 465, 469

13

1   (9th Cir. 1994).  The relevant inquiry is not whether the evidence excludes every hypothesis

2   except guilt, but whether the jury could reasonably arrive at its verdict.  United States v. Mares,

3   940 F.2d 455, 458 (9th Cir.1991).  Thus, "[t]he question is not whether we are personally

4   convinced beyond a reasonable doubt.  It is whether rational jurors could reach the conclusion

5   that these jurors reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir.1991).  The federal

6   habeas court determines sufficiency of the evidence in reference to the substantive elements of

7   the criminal offense as defined by state law.  Jackson, 443 U .S. at 324 n. 16; Chein, 373 F.3d at

8   983.

9        Under California law, a robbery-murder special circumstance can be found true if "[t]he

10  murder was committed while the defendant . . . was an accomplice in . . .  the attempted

11  commission of . . . [r]obbery[.]"  Cal. Penal Code § 190.2(a)(17)(A).  As discussed by the

12  California Court of Appeal, "every person, not the actual killer, who, with reckless indifference to

13  human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests,

14  or assists in the commission of a [robbery] which results in the death of some person or persons,

15  and who is found guilty of murder in the first degree therefor, shall be punished by death or

16  imprisonment in the state prison for life without the possibility of parole if a special circumstance

17  [such as robbery] has been found to be true."  Cal. Penal Code § 190.2(d).

18       Petitioner argues that there is insufficient evidence that she acted with reckless

19  indifference to human life.  ECF No. 1, 29.  The "statutory language of section 190.2(d) . . .

20  derives verbatim from the United States Supreme Court's decision in Tison v. Arizona[,]" in

21  which the Court found that "reckless indifference to human life" refers to a mental state in which

22  "the defendant 'knowingly engag[es] in criminal activities known to carry a grave risk of death.'"

23  People v. Estrada, 11 Cal.4th 568, 575-77, 46 Cal.Rptr.2d 586, 904 P.2d 1197 (1995) (quoting

24  Tison v. Estrada, 481 U.S. 137, 157, 107 S. Ct. 1676, 95 L.Ed.2d 127 (1987)).  In other words,

25  "reckless indifference to human life" is a "'subjective awareness of the grave risk to human life

26  created by his or her participation in the underlying felony.'"  People v. Proby, 60 Cal.App.4th

27  922, 928, 70 Cal.Rptr.2d 706 (1998) (quoting Estrada, 11 Cal.4th at 578).

28  /////

14

1    Petitioner concedes that there is evidence on record that she "lured the victim into the

2    alleyway with knowledge that Cristo Lopez was lurking nearby, prepared to steal from the

3    victim." ECF No. 1, 29.  However, she asserts that "the theft or even robbery was likely to come

4    off without anyone getting hurt."  Id.  She also argues that she was unaware that Lopez had a gun

5    and, therefore, she was unaware of the grave risk of death involved.  Id. at 32-33.  Petitioner

6    alleges that the fact that she "screamed and ran off when the gun was displayed and before the

7    gun was fired" indicates that she didn't know Lopez had a gun and that she was not actively

8    involved in the killing.  Id. at 30-32.

9    Viewing the evidence in the light most favorable to the verdict, and with the

10   understanding that the appellate court conclusion of sufficiency must be AEDPA unreasonable in

11   order to grant a petition based on insufficiency, the undersigned agrees with the California Court

12   of Appeal and concludes that there was sufficient evidence from which a rational trier of fact

13   could have found beyond a reasonable doubt that petitioner acted with the reckless indifference to

14   human life.  In reviewing petitioner's argument, the California Court of Appeal noted that Lopez

15   told law enforcement that petitioner knew he had the gun, and she may have been planning "to

16   jack the guy" behind Lopez's back.  Lopez, 198 Cal.App. 4th at 1116.  The court also found that

17   petitioner was with Lopez when he presumably picked up the gun from Lynch's house, although

18   she did not go inside Lynch's house.  Id.  The court also noted that petitioner's act of luring the

19   victim into the secluded alley was critical to the robbery's success.  Lastly, the court discussed

20   how rather than helping the victim or calling 911 after hearing the gunshot, petitioner went to

21   Lynch's house, stayed with Lopez for the rest of the night, and, on the evidence, engaged in

22   sexual intercourse with him.  Id.

23   This evidence fully supports the jury's finding that petitioner's actions reflect a reckless

24   indifference for human life.  In addition to the above factors recounted by the Court of Appeal, it

25   would be unreasonable for petitioner to think Lopez did not have a gun—that he was going to

26   commit a robbery of a man, unknown to him with respect to being armed or otherwise

27   formidable, in a dark alley, with simple swagger.  The jury could use its common sense in

28   rejecting petitioner's assertions of ignorance.  There was sufficient evidence from which a

15

1  reasonable jury could conclude that petitioner was aware that the crime in which she participated

2  presented a grave risk of death.  Thus, the state courts' denial of habeas relief with respect to

3  petitioner's insufficient evidence claim is not an objectively unreasonable application of <u>Jackson</u>

4  and <u>Winship</u> to the facts of the case.  Accordingly, this claim should be denied.

5  III.  <u>Failure to Instruct the Jury on a Lesser Included Offense</u>

6      Petitioner claims that "[t]he trial court improperly failed to instruct the jury on the lesser

7  included offense of voluntary manslaughter based on attempted grand theft person."  ECF No. 1,

8  38.  Specifically, petitioner argues that there was substantial evidence in the record to support a

9  finding that she lacked knowledge of Lopez's possession of the gun and had no intent to harm the

10  victim or commit an inherently dangerous crime.  <u>Id.</u> at 38-44.  Therefore, she asserts, the trial

11  court was required to instruct on the aforementioned lesser included offense.  <u>Id.</u>

12      Petitioner raised this claim on direct appeal.  The California Court of Appeal rejected

13  petitioner's claim as set forth in the following portion of the opinion[1]:

14
15
> Brousseau contends she was entitled to voluntary manslaughter
> instructions, on the theory that she aided attempted grand theft
> rather than robbery. FN8

16
17
18
19
>> FN8.  Brousseau's counsel agreed no included offense
>> instructions should be given.  Later, Lopez sought and
>> obtained instructions on lesser offenses.  But there is no
>> forfeiture or waiver of Brousseau's claim, because the duty
>> to instruct on included offenses does not turn on counsel's
>> wishes.  (<u>People v. Golde</u> (2008) 163 Cal.App.4th 101,
>> 115.)

20
21
22
23
24
25
> Brousseau reasons as follows: Theft is necessarily included within
> robbery.  (<u>People v. Ramkeesoon</u> (1985) 39 Cal.3d 346, 351
> ["Theft is a lesser and necessarily included offense in robbery;
> robbery has the additional element of a taking by force or fear"].)
> The jury could have found she aided an attempted grand theft from
> the victim's person.  (§ 487, subd. (c).)  If so, felony murder would
> not apply because grand theft is not an enumerated felony for
> felony murder.  (§ 189.)  She might instead be liable for voluntary
> manslaughter by aiding the commission of a felony not inherently
> dangerous.  (See <u>People v. Garcia</u> (2008) 162 Cal.App.4th 18, 31.)

26
27
> Assuming for the sake of argument that the legal framework
> Brousseau constructs is sound, FN9 we reject her predicate
> contention that substantial evidence would support a finding that

28  [1]  This portion of the California Court of Appeal's opinion was not certified for publication.

she aided attempted grand theft.

> FN9.  The People cite authority to the effect that voluntary manslaughter and second degree murder are not included offenses of felony murder.  (See People v. Anderson (2006) 141 Cal.App.4th 430, 444-45 [assuming the point, but information alleged murder, not felony murder].)  We need not address this point, however, and shall refrain from doing so.

"[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude[]"' that the lesser offense, but not the greater, was committed."  (People v. Breverman (1998) 19 Cal.4th 142, 162.)

Brousseau and Lopez both testified they had no intent to rob the victim.  Neither claimed the intent to take property from the victim without force, nor did any other witness provide testimony from which such intent rationally could be inferred.

Brousseau suggests the victim could suffer a grand theft "by the perpetrator reaching in and stealing the victim's cash," and other ways.  In the reply brief, she elaborates:

> "[A]n attempted theft could occur if the victim took out his entire money roll ($200) in order to pay appellant Brousseau 20 or 40 dollars [as bargained for an act of prostitution].  Unseen, Cristo Lopez would approach from the rear in the dark and snatch the entire money roll for a 'quick come up.'  Something like this, involving no gun and no force, is probably what was contemplated under the version described by Amy Crawford."

This scenario, while creative, is completely lacking in evidentiary support.  An instruction on a lesser offense must be based on evidence, not imagination.  While the jury may have rejected any piece of evidence, we see no evidence, either accepted or rejected, that shows a plan to steal without force or fear.  Therefore there was no basis for an instruction on attempted grand theft, and no basis for an instruction on an alternate form of homicide to felony murder as to Brousseau.

Lod. Doc. 4 at 27-29.

In Beck v. Alabama the United States Supreme Court held that criminal defendants possess a constitutional right to have the jury instructed on a lesser included offense in a capital murder case, but expressly reserved the question of whether due process mandates the application

17

of the same right in a non-capital case.  447 U.S. 625, 638 n.7, 100 S. Ct. 2382 (1980); <u>Solis v. Garcia</u>, 219 F.3d 922, 928 (9th Cir. 2000).  The Ninth Circuit has held that in a non-capital case the "[f]ailure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."  <u>Bashor v. Risley</u>, 730 F.2d 1228, 1240 (9th Cir. 1984) (quoting <u>James v. Reese</u>, 546 F.2d 325, 327 (9th Cir. 1976) (per curiam)).  Thus, in a non-capital case such as the one presented here, the failure of a trial court to sua sponte instruct on a lesser included offense does not present a federal constitutional question that would warrant habeas corpus relief.  <u>Windham v. Merkle</u>, 163 F.3d 1092, 1106 (9th Cir. 1998).

The Ninth Circuit in <u>Solis</u> noted that there might exist an exception to this general rule for adequate jury instructions on a defendant's theory of defense.  <u>Solis</u>, 219 F.3d at 929 (citing <u>Bashor</u>, 730 F.2d at 1240, but noting that <u>Windham</u>, 163 F.3d at 1106, mentioned no such exception to the general rule).  Even if a "theory of the defense" exception exists, that is, even assuming the failure to instruct on a lesser included offense raises a federal issue, it is not applicable here.  As the California Court of Appeal found, there was insufficient evidence to support a theory of attempted grand theft because the evidence of the case does not demonstrate that petitioner's luring the victim into the alley was anything but an effort on her part to take the victim's property by force or fear.  Petitioner's argument that she only knew "Lopez intended to snatch the victim's money while he was in a vulnerable position, without the use of force or violence," is, as noted by the Court of Appeal, and the undersigned, creative, but wholly lacking in evidentiary support or common sense.  ECF No. 1, 47; Lod. Doc. 4 at 29.  This being the case, a sua sponte instruction of attempted grand theft, was unwarranted.  <u>People v. Mendoza</u>, 24 Cal.4th 130, 174, 99 Cal.Rptr. 485 (2000) (lesser included offense instruction must be given only when the evidence warrants it).  Because the state court decision was not an unreasonable application of clearly established Supreme Court authority, this claim should be denied.

IV.  <u>Jury Instruction that an Aider and Abettor is "Equally Guilty" of the Crime</u>

Petitioner claims that "the trial court improperly instructed the jury that the defendant is 'equally guilty' of the crime committed by the perpetrator which she aided and abetted."  ECF

No. 1, 34.  Petitioner argues that former CALCRIM 400 was a burden-shifting instruction in violation of her right to due process because it created a conclusive presumption that an aider and abettor is equally guilty as the principal.  Id. at 35-37.

Petitioner raised this claim on direct appeal.  The California Court of Appeal rejected petitioner's claim as set forth in the following portion of the opinion:

> Brousseau contends the trial court erred by instructing the jury that a perpetrator and an aider are "equally guilty" of the crime.   Any error was harmless.
>
> The introductory instruction to the series of instructions on aiding, CALCRIM No. 400, as given in this case, provides:
>
>> "A person may be guilty of a crime in two ways.  One, he or she may have directly committed the crime.  I will call that person the perpetrator.  Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.  A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it."
>
> Generally, a person who is found to have aided another person to commit a crime is "equally guilty" of that crime.  (§ 31; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 77, pp. 122-123, italics added.)
>
> However, in certain cases, an aider may be found guilty of a greater or lesser crime than the perpetrator.  (People v. McCoy (2001) 25 Cal.4th 1111, 1114-1122 [an aider might be found guilty of first degree murder, even if shooter is found guilty of manslaughter on unreasonable self-defense theory]; People v. Woods (1992) 8 Cal.App.4th 1570, 1577-1578 [aider might be guilty of lesser crime than perpetrator, where ultimate crime was not reasonably foreseeable consequence of act aided, but a lesser crime committed by perpetrator during the ultimate crime was a reasonably foreseeable consequence of the act aided].)
>
> Because the instruction as given was generally accurate, but potentially incomplete in certain cases, it was incumbent on Brousseau to request a modification if she thought it was misleading on the facts of this case.  Her failure to do so forfeits the claim of error.  (People v. Lang (1989) 49 Cal.3d 991, 1024 [party may not claim "an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language"]; see People v. Samaniego (2009) 172 Cal.App.4th 1148, 1163-1165 (Samaniego) [challenge to CALCRIM No. 400 forfeited for failure to seek modification]; but see People v. Nero (2010) 181 Cal.App.4th 504, 517-518 (Nero) [construing CALJIC No. 3.00, also using the "equally guilty" language, and finding it misleading "even in unexceptional circumstances"].) FN5

19

FN5.  We note that CALCRIM No. 400 has been amended to remove the "equally guilty" language.  (Judicial Council of Cal., Crim. Jury Instns. (2011) p. 167.)

Further, we see no prejudice.  Brousseau contends the jury may have found she intended to commit a theft from the person of the victim, not a robbery.  But the gist of her testimony was that she had no criminal purpose and was surprised by Lopez's actions.  As we explain in the unpublished portion of our opinion, there was no evidence she intended to help Lopez steal from the victim, other than by use of force or fear.

To the extent Brousseau contends the instruction reduced the People's burden of proof by eliminating the need to prove Brousseau's intent, we disagree.  "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions."  (People v. Sanchez (2001) 26 Cal.4th 834, 852.)  Other instructions elaborated on the required intent.

CALCRIM No. 401, as given in this case, provided in part:

> "To prove that defendant, Rebecca Brousseau is guilty of attempted robbery crime [sic] based on aiding and abetting that crime, the People must prove that:

> "1. The perpetrator committed the crime;

> "2. The defendant knew that the perpetrator intended to commit the crime;

> "3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

> "AND

> "4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

> "Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

By specifying attempted robbery, and stating the aider must share the perpetrator's purpose to commit "that" crime, the instruction told the jury it had to find Brousseau shared Lopez's purpose to commit a robbery.  Further, CALCRIM No. 540B, defining Brousseau's liability for murder, required the jury to find she "committed or attempted to commit, or aided and abetted a robbery" before finding murder liability.  Robbery was defined, and the jury was told, "To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the

1      commission of the robbery."

2          Thus, even if we were to accept Brousseau's premise that
       CALCRIM No. 400 impairs the intent element, the error was
3      harmless because the point was covered elsewhere.   (People v.
       Stewart (1976) 16 Cal.3d 133, 141; Samaniego, supra, 172
4      Cal.App.4th at p. 1165.) FN6

5              FN6.  In Nero, supra, 181 Cal.App.4th 504, when asked by
               the jury whether there could be different levels of liability
6              between perpetrator and aider, the trial court twice referred
               it to an instruction using the "equally guilty" language, and
7              there was evidence supporting different levels of liability.
               Nero found the error prejudicial.  (Id. at pp. 518-20.)  No
8              jury confusion is evidenced in this case, nor is there
               evidence showing Brousseau could be guilty of something
9              less than felony murder, along with Lopez.  Therefore, even
               if Nero were correctly decided, it does not require reversal
10             in this case.

11         Contrary to Brousseau's claim in the reply brief, the other
       instructions given (CALCRIM Nos. 401 and 540B) did not conflict
12     with the "equally guilty" language in CALCRIM No. 400; they
       defined and detailed the circumstances under which Brousseau
13     could be found liable for the same crimes as Lopez.

14         In the absence of evidence of Lopez's intent to commit any crime
       other than robbery, and considering the detailed instructions
15     requiring the jury to find Brousseau aided a robbery, no rational
       jury would have misused the "equally guilty" language to convict
16     her of attempted robbery without finding she intended to aid a
       robbery.  Therefore, any error was harmless.

17

18   Lopez, 198 Cal.App. 4th at 1118-1120; Lod. Doc. 4 at 18-22.

19         A challenge to a jury instruction solely as an error of state law does not state a claim

20   cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71–72, 112 S.

21   Ct. 475, 116 L.Ed.2d 385 (1991) (habeas corpus is unavailable for alleged error in the

22   interpretation or application of state law); see also Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th

23   Cir. 1983); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  The standard of review for

24   a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws,

25   or treaties of the United States."  Estelle, 502 U.S. at 62.  In order for error in the state trial

26   proceedings to reach the level of a due process violation, the error had to be one involving

27   "fundamental fairness," Id. at 73.  The Supreme Court has defined the category of infractions that

28   violate fundamental fairness very narrowly.  Id.

                                          21

1    In order to establish a due process violation, petitioner must show both ambiguity in the

2    instructions and a "reasonable likelihood" that the jury applied the instruction in a way that

3    violates the Constitution, such as relieving the state of its burden of proving every element

4    beyond a reasonable doubt.  Waddington v. Sarausad, 555 U.S. 179, 190 129 S. Ct. 823, 831, 172

5    L.Ed.2d 532 (2009).  Petitioner must show that the ailing instruction by itself so infected the

6    entire trial that the resulting conviction violates due process.  Estelle, 502 U.S. at 72.

7    Additionally, the instruction may not be judged in artificial isolation, but must be considered in

8    the context of the instructions as a whole and the trial record.  Id.  The court must evaluate jury

9    instructions in the context of the overall charge to the jury as a component of the entire trial

10   process.  See United States v. Frady, 456 U.S. 152, 169, 102 S. Ct. 1584, 71 L.Ed.2d 816 (1982).

11   Furthermore, even if it is determined that the instruction violated the petitioner's right to due

12   process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial

13   influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson,

14   507 U.S. 619, 637, 113 S. Ct. 1710, 123 L.Ed.2d 353 (1993), which is whether the error had

15   substantial and injurious effect or influence in determining the jury's verdict.  See Hedgpeth v.

16   Pulido, 555 U.S. 57, 61–62, 129 S. Ct. 530, 172 L.Ed.2d 388 (2008) (per curiam).

17   Petitioner argues that "[t]he version of CALCRIM 400 read in [her] trial relieved the

18   prosecution of its burden of proof, which was to demonstrate that [she] shared Lopez' criminal

19   intent."  ECF No. 1, 35.  She asserts that although there was substantial evidence that the crime

20   for which she shared the intent was grand theft person rather than robbery, the "equally guilty"

21   language in this instruction resolved the issues of whether she knew Lopez intended a robbery,

22   knew of the gun, and shared his criminal intent in the affirmative.  Id. at 36.  However, petitioner

23   recognizes that the trial court read CALCRIM 401, which required a shared intent between the

24   perpetrator and the aider and abettor.  Id.

25   This Court agrees with the reasoning of the California Court of Appeal.  While there may

26   be circumstances where an aider and abettor may be liable for a lesser crime so that CALCRIM

27   400, as read in the instant case, may be improper, that is not the case here.  As the Court of

28   Appeal noted, there was no evidence that petitioner had the intent to commit any other crime than

robbery.  If petitioner was guilty of the attempted robbery of the victim, then she and the shooter were equally guilty of first degree murder.  CALCRIM 400 did not violate petitioner's right to due process.  Accordingly, even if the assailed instruction shifts the burden of proof (slightly) in the abstract, there is no prejudice, and this claim should be denied.

V.  Life Without Possibility of Parole Sentence

Petitioner claims that her sentence is "unconstitutional within the meaning of the state and federal constitutions."  ECF No. 1, 48.  Specifically, petitioner contends that the sentence of life without parole is cruel and unusual because it is grossly disproportionate to the severity of the crime, shocks the conscience, and offends fundamental notions of human dignity.[2]  Id. at 48-54.

Petitioner raised this claim on direct appeal.  The California Court of Appeal rejected petitioner's claim as set forth in the following portion of the opinion[3]:

> In two related arguments, Brousseau contends her sentence of life without parole violates state and federal constitutional norms, and the trial court should have granted her motion to strike the robbery-murder special circumstance finding.
>
> Taking the last point first, the People did not seek the death penalty. Accordingly, upon the verdict finding the robbery-murder special circumstance to be true, the statutorily mandated punishment was life in prison without the possibility of parole.  The trial court lacked discretion to strike the robbery-murder special circumstance finding to reduce the punishment.  (§§ 190.2, subd. (a), 1385.1; see People v. Johnwell (2004) 121 Cal.App.4th 1267, 1283-1285 (Johnwell); People v. Mora (1995) 39 Cal.App.4th 607, 614-615 (Mora).)
>
> However, the trial court had the obligation to reduce the sentence if required under compulsion of the United States or California Constitutions.  (See Mora, supra, 39 Cal.App.4th at p. 615; see also Johnwell, supra, 121 Cal.App.4th at p. 1285.)
>
> We have summarized the federal standards as follows:
>
> > "The Eighth Amendment to the United States Constitution proscribes 'cruel and unusual punishment' and 'contains a "narrow proportionality principle" that "applies to

---

[2]  Petitioner initially asserts that her sentence is unconstitutional because her murder liability was improperly established under the felony murder rule.  ECF No. 1, 48.  This claim is based on her previous argument that there was "insufficient evidence on the record to establish 'reckless disregard for human life.'"  Id.; section II., supra.  Because her contention relies on an underlying claim that has been addressed and deemed to lack merit, it need not be readdressed here.

[3]  This portion of the California Court of Appeal's opinion was not certified for publication.

noncapital sentences."' [Citations.] That principle prohibits "'imposition of a sentence that is grossly disproportionate to the severity of the crime'" [citations], although in a noncapital case, successful proportionality challenges are "'exceedingly rare.'" [Citation.]

"A proportionality analysis requires consideration of three objective criteria, which include '(i) the gravity of the offense and the harshness of the penalty; (ii) the sentence imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.' [Citation.] But it is only in the rare case where a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality that the second and third criteria come into play." (People v. Meeks (2004) 123 Cal.App.4th 695, 707 (Meeks).)

Considering the offense--murder with special circumstances--was among the gravest possible, and could have led to capital punishment, we find no disproportionality, gross or otherwise, between the offense and the sentence. Thus, we need not examine the remaining two federal criteria. (Meeks, supra, 123 Cal.App.4th at p. 707.) FN14

FN14. Although Brousseau purports to make intra- and interstate comparisons, she fails to provide any citations to authority, and therefore has forfeited those contentions. (See In re S.C. (2006) 138 Cal.App.4th 396, 408; People v. Anderson (2007) 152 Cal.App.4th 919, 929.)

We have summarized the California standards as follows:

"The California Constitution prohibits "cruel or unusual punishment." (Cal. Const., art. I, § 17, italics added.) A punishment may violate the California Constitution 'although not cruel or unusual in its method, [if] it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' (In re Lynch [(1972) 8 Cal.3d 410, 424].)

"The court in In re Lynch spoke of three 'techniques' the courts have used to administer this rule, (1) an examination of the 'nature of the offense and/or the offender, with particular regard to the degree of danger both present to society' [citation], (2) a comparison of the challenged penalty with the punishments prescribed for more serious offenses in the same jurisdiction [citation], and (3) 'a comparison of the challenged penalty with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision' [citation]." (Meeks, supra, 123 Cal.App.4th at p. 709.)

As stated earlier, Brousseau's life without parole sentence is not disproportionate to the crime of first degree murder, and certainly

24

not "so disproportionate . . . that it shocks the conscience and offends fundamental notions of human dignity."   (In re Lynch, supra, 8 Cal.3d at p. 424; see People v. Em (2009) 171 Cal.App.4th 964, 972-976 (Em) [50-years-to-life murder based on aiding a gangrelated robbery in which a person was killed with a firearm was not disproportionate for a 15 year old].)

Brousseau relies on People v. Dillon (1983) 34 Cal.3d 441 (Dillon), a divided decision on unique facts, FN15 partly summarized as follows:

> FN15.  Justice Richardson dissented in part, stating Dillon "was personally responsible for, and morally guilty of, a homicide committed in the attempted perpetration of a robbery.  Although defendant, had he been a year older, could have been sentenced to death or life imprisonment without parole, by reason of his youth he received a far less severe sentence." (Dillon, supra, 34 Cal.3d at p. 502 (conc. & dis. opn. of Richardson, J.).) Justices Kaus and Broussard, too, disagreed with the majority holding. (Id. at p. 490 (conc. opn. of Kaus, J.), p. 504 (conc. & dis. opn. of Broussard, J.) [noting Dillon planned the robbery].)

> "Dillon, supra, 34 Cal.3d at page 479, on which defendant relies, holds that murder committed in the commission of a robbery is a serious crime presenting a high level of danger to society.  In that case, however, our Supreme Court concluded the facts of the specific crime in question and the defendant's culpability weighed in favor of concluding the imposition of a life sentence constituted cruel or unusual punishment. . . .  The shooting in Dillon occurred during an attempt to steal marijuana plants the victim was cultivating. (Id. at pp. 451–452.)   The defendant had previously overheard the victim threaten to shoot anyone coming on his property.   (Id. at p. 451.)   An accidental firearm discharge during the attempted robbery alerted the victim to the presence of the defendant and his cohorts.   (Id. at p. 452.)   The defendant heard the victim approaching, saw him carrying a shotgun, and, '[w]hen [the victim] drew near, defendant began rapidly firing his rifle at him.'" (Em, supra, 171 Cal.App.4th at p. 973.)

Dillon was 17, and "unusually immature and childlike, even for a person of 17" (People v. Young (1992) 11 Cal.App.4th 1299, 1310) and both "the judge and the jury believed that the sentence was excessive in relation to [his] culpability."   (People v. Weddle (1991) 1 Cal.App.4th 1190, 1197.)

In contrast, Brousseau was 32 years old and there was no evidence she was unusually immature or had any cognitive impairment.  She planned with Lopez to ambush the victim in his car, and was not a minor participant.  This case is not like Dillon.  (See Em, supra, 171 Cal.App.4th at p. 973 ["The facts in Dillon contrast dramatically with the ambush robbery and murder of . . . an innocent person sitting in his car"].)

25

1
2
3
4
5
6

> Brousseau argues she was a homeless methamphetamine addict and prostitute, with two misdemeanor theft convictions, "a wife and a mother" who did not know Lopez was armed, and argues the offense was an "aberration."  Putting aside the evidence showing she knew Lopez was armed (see part I, ante), Brousseau was not an immature youth.  She willingly agreed to lure the victim into a secluded alley so Lopez could rob him, apparently because her companions had run out of beer.  After the shooting, she did nothing to help the victim or alert the authorities.  She hung out, did drugs, and had sex with Lopez after the shooting.  She never reported the crime, which remained unsolved for many months.

7
8
9
10

> Brousseau's liability for murder satisfied constitutional norms, because she acted with reckless indifference to the victim's life. (See part I, ante.)  In short, a life without parole sentence is not disproportionate punishment for an adult who actively participates in a felony murder, either in the abstract, or as applied to Brousseau's particular case.

11     Lod. Doc. 4 at 37-42.

12          The United States Supreme Court has held that the Eighth Amendment includes a "narrow

13     proportionality principle" that applies to terms of imprisonment.  See Harmelin v. Michigan, 501

14     U.S. 957, 996, 111 S. Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring); see also

15     Taylor v. Lewis, 460 F.3d 1093, 1097 (9th Cir. 2006).  However, as the state court observed,

16     successful challenges in federal court to the proportionality of particular sentences are

17     "exceedingly rare."  Solem v. Helm, 463 U.S. 277, 289-90, 103 S. Ct. 3001, 77 L.Ed.2d 637

18     (1983); see also Ramirez v. Castro, 365 F.3d 755, 775 (9th Cir. 2004).  "The Eighth Amendment

19     does not require strict proportionality between crime and sentence.  Rather, it forbids only

20     extreme sentences that are 'grossly disproportionate' to the crime."  Ewing v. California, 538 U.S.

21     11, 23, 123 S. Ct. 1179, 155 L.Ed.2d 108 (2003) (quoting Harmelin, 501 U.S. at 1001 (Kennedy,

22     J., concurring)); see also Lockyer, 538 U.S. at 73 (in addressing an Eighth Amendment challenge

23     to a prison sentence, the "only relevant clearly established law amenable to the 'contrary to' or

24     'unreasonable application of' framework is the gross disproportionality principle").

25          In assessing the compliance of a non-capital sentence with the proportionality principle, a

26     reviewing court must consider "objective factors" to the extent possible.  Solem, 463 U.S. at 290.

27     Foremost among these factors are the severity of the penalty imposed and the gravity of the

28     offense.  Id. at 290-291.  If "a threshold comparison of the crime committed and the sentence

1   imposed leads to an inference of gross disproportionality," the reviewing court should compare

2   the sentence with sentences imposed on other criminals in the same jurisdiction and for the same

3   crime in other jurisdiction.  Harmelin, 501 U.S. at 1005.  "Comparisons among offenses can be

4   made in light of, among other things, the harm caused or threatened to the victim or society, the

5   culpability of the offender, and the absolute magnitude of the crime."  Taylor, 460 F.3d at 1098.

6   If a comparison of the crime and the sentence does not give rise to an inference of gross

7   disproportionality, a comparative analysis is unnecessary.  Id.

8          There can be no inference of gross disproportionality here.  Petitioner—a 32 year old

9   adult, drug addict, and prostitute—lured a man into a secluded alleyway under the guise of

10  prostitution in order for her companion take his money, which was needed for them to buy beer.

11  She has never alleged that she said or did anything to prevent or dissuade Lopez from using the

12  weapon when he approached the victim, she merely ran away.  Also, after the crime was

13  committed, she did nothing to report the crime and ended up staying the night in the same room

14  with Lopez, allegedly doing drugs and having sex with him.

15         Furthermore, as respondent notes, in Harmelin, the United States Supreme Court stated

16  that "the crime of felony murder without specific intent to kill, [is a] crime for which no sentence

17  of imprisonment would be disproportionate."  501 U.S. at 1004.  In Harmelin, the Supreme Court

18  found that a sentence of life without the possibility of parole for a first-time offense of possession

19  of a substantial amount of cocaine did not raise an inference of gross disproportionality.  Id. at

20  994–96.  Moreover, similar sentences have been upheld for crimes that did not result in a murder.

21  See Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166, 155 L.Ed.2d 144 (2003) (upholding two

22  consecutive sentences of 25 years to life for shoplifting $150 worth of videotapes, in light of

23  defendant's prior record); Ewing, 538 U.S. 11 (upholding 25 years to life sentence for recidivist

24  offender convicted of felony grand theft); Rummel v. Estelle, 445 U.S. 263, 284, 100 S. Ct. 1133,

25  63 L.Ed.2d 382 (1980) (upholding life sentence imposed after third nonviolent felony conviction).

26         Applicable Supreme Court precedent does not permit this Court to find that petitioner's

27  sentence is disproportionate within the meaning of the Eighth Amendment, much less that the

28  state court's conclusion to the contrary was an unreasonable application of clearly established

1   federal law.  Thus, this claim should be denied.

2          Based on the state court record in this case, AEDPA requires the undersigned to uphold

3   the state court determinations as they were not AEDPA unreasonable.

4   <u>CONCLUSION</u>

5          For all of the foregoing reasons, the petition should be denied.  Pursuant to Rule 11 of the

6   Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of

7   appealability when it enters a final order adverse to the applicant.  A certificate of appealability

8   may issue only "if the applicant has made a substantial showing of the denial of a constitutional

9   right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth in these findings and recommendations,

10  a substantial showing of the denial of a constitutional right has not been made in this case.

11         Accordingly, IT IS HEREBY RECOMMENDED that:

12         1.  Petitioner's application for a writ of habeas corpus (ECF No. 1) be DENIED; and

13         2.  The District Court decline to issue a certificate of appealability.

14         These findings and recommendations are submitted to the United States District Judge

15  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

16  after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

19  shall be served and filed within fourteen days after service of the objections.  Failure to file

20  objections within the specified time may waive the right to appeal the District Court's order.

21  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

22  Dated: March 10, 2014

23                                          /s/ Gregory G. Hollows

24                                  UNITED STATES MAGISTRATE JUDGE

25

26

27  GGH:33/Brou0301.hc.fr

28

28